## LEATHEM SMITH–PUTNAM NAVIGATION CO. v. OSBY et al.*

### No. 5303.

Circuit Court of Appeals, Seventh Circuit.

Aug. 7, 1935.

Rehearing Denied Sept. 18, 1935.

Robert Branand, Jr., and Edward B. Hayes, both of Chicago, Ill., for appellant.

John S. Lord, A. C. Wetterstorm, L. Duncan Lloyd, and Curt H. G. Heinfelden, all of Chicago, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Appellees, members of the crew of a motor vessel, Material Service, filed suits at law to recover, under the Jones Act, § 1, 46 USCA § 688, damages for injuries resulting from an explosion upon the .boat, on November 30, 1930, about 10 a. m. while it was proceeding up the Illinois Drainage Canal. Appellant filed its petition for exemption from, and limitation of, liability, as owner of the vessel, and the court restrained the suits at law. Answers and claims for damages in behalf of each of the appellees and one Delia Embury, an invitee, were filed. The District Court found appellant liable to the members of

* Writ of certiorari denied 56 S. Ct. 370, 80 L. Ed. ——.

the crew, but not as to the invitee. There was no appeal as to the latter finding.

The decree was based upon the Jones Act, § 1 (46 USCA § 688), which creates a remedy whereby damages at law resulting from negligence of the parties in charge of the ship may be recovered by any seaman. This remedy is governed by the statutes of the United States respecting liability for injuries to railway employees (45 USCA §§ 51–59), and the effect is to give to seamen the same cause of action at law for negligence as is given to railway employees. Contributory negligence is a matter of defense and merely mitigates the amount of damages. Defenses based upon the fellow-servant rule are abolished.

The answers of appellees charged that appellant permitted the vessel to become and remain defective in many particulars and to be unsafe, so that explosive gases and fumes accumulated in dangerous quantities, and averred that, by reason of the said negligence, the gases exploded, causing the injuries sustained by appellees. There was no direct evidence as to the cause of the explosion, but certain facts and circumstances were received in evidence with respect thereto.

The explosion occurred in the steering gear room at the extreme aft on the main deck. The walls, doors, and bulkheads were from three-sixteenths to three-eighths of an inch thick. In the room were the steering engine, mufflers, and two electric motors, one above the floor on the port side, another on the floor, amidships. Through the room, from top to bottom, ran the iron flue of the heating boiler. The door entering from the galley was cut in half, so as to afford ventilation. When it was open it swung into the galley against the refrigerator. In the room were two deadlights, round holes through the hull at the stern, one to port and one to starboard, each about a foot in diameter, located 5 or 5½ feet above the deck, with glass covers capable of being opened. There were two hatches or openings in the quarter deck, provided with covers, which were usually left open. The room was lighted by two electric globes. Five irregular holes had been burned through the forward bulkheads with an acetylene gas torch, admitting five pipes into the galley.

Beyond this bulkhead amidships lay the officers' dining room, and on the starboard side the captain's cabin. Forward from the galley was the crew's mess, which was separated from the galley by a bulkhead, three-sixteenths inch thick, through which an opening had been cut to pass food from the galley to the mess. All the rooms mentioned, including pilot house, captain's cabin, and a tier of rooms on the starboard side, had for their floor the main deck and for their top, the quarter deck.

Under the main deck and beneath the steering gear room and various of the other rooms mentioned was a water ballast tank, known as the afterpeak tank. It was located farthest aft in the ship and separated from the further forward parts by a bulkhead immediately under the forward end of the officers' dining room. It extended thence aft to the stern, had a capacity of thirty tons and communicated directly with the officers' dining room by means of a manhole through the main deck. There were holes for bolts in the cover and corresponding holes through the deck, but no bolts were used prior to the explosion. It was impossible to adjust the cover so that at least some of the holes through the deck would not find a corresponding hole in the cover, and it was difficult to adjust it so that more than two holes were not open. The cover frequently slid off into the room. The captain's toilet soil pipe ran through the afterpeak tank and had its vent outside the hull. Various witnesses testified there were strong odors in the tank and in the steering gear room.

In the spring, before the explosion, odors from the tank were noticed in the dining room. An investigation disclosed a two-inch hole in the soil pipe, which was then plugged, and the tank washed out. The afterpeak tank communicated with the steering engine room, by two four-inch gooseneck vents and two three-quarter inch holes and directly with the interior of the refrigerator by means of the refrigerator defrosting one-inch drain pipe.

From the engine room the exhaust pipes ran from two Diesel engines aft above the water in the afterpeak tank and then up into the steering engine room, where they passed through mufflers and thence out into the open air. The fuel oil for the engines was kept in tanks located half way between bow and stern. The heating boiler was in the engine room. Its flue, an iron pipe eight inches in diameter, ran aft from the engine room, above the water of the

afterpeak tank and turned up through the steering engine room floor through the latter room and thence through the quarter deck out into the open air.

The vessel left Lockport, laden with a cargo of gravel, bound for Chicago, on November 30, 1930 at about 4:50 a. m., and did not stop until the explosion occurred.

The evidence, though disputed, justified the finding of the court that the tank was filled with water at Bubbly creek. The water there is thoroughly permeated by sewage from the stockyards and contains putrifying animal matter; great bubbles of gas arise from the fermentation of the same at the bottom. It was said that the water was so thick that rats could run across it; that it clogged the sea cocks, and that it became necessary to use compressed air to clear them out.

The gas produced in this sewage is methane, which is odorless and explosive. The solid contents of the tank when full of such water was about thirty pounds. Each pound of solid gives off a maximum of six cubic feet of methane gas. The total amount of methane gas that could be produced from the sewage solids in the water, then, would be 180 cubic feet, which would pass through the steering gear room through the four-inch gooseneck vents. The air space of the steering gear room was 1,248 cubic feet. If the entire 180 cubic feet of gas passed into the room there would be a mixture of 14.4 per cent. of methane and 85.6 per cent. of air. Five per cent. of methane gas would cause an explosion. There was testimony to the effect that methane gas disappears by oxidation, when it comes in touch with red-hot pipes, but the exhaust pipe from the engine to which this gas might have been exposed was not always red hot, and appellees contended, and the court apparently believed, that the pipe did not oxidize the gases.

Carbon monoxide passed through the exhaust pipes, which turned at right angles more than once and followed, according to the evidence, an unusual form of construction, tending to create back pressure, and thereby contributing to incomplete combustion of gases. Black smoke in the exhaust also indicated incomplete combustion. The steering room walls had to be cleaned frequently, and the mufflers in the steering room, according to the testimony of appellees, leaked at the joints, so that

gas escaped. The steering gear room was closed at the time of the explosion, which, according to the testimony of some witnesses, was of low type, and according to other witnesses, of high type.

Appellees did not claim that there was enough carbon monoxide of itself to cause explosion; but they offered proof that diffusion or spontaneous mixing is characteristic of all gases; that it is a slow process, which may require days and hours for completion.

Without going at further length into the evidence with respect to this gas, it is apparent that the court, relying upon the evidence that gas was always present, was justified in concluding that there were present substantial amounts of carbon monoxide, which would readily mix with methane gas, likewise present, and of explosive character.

There was no evidence of the presence of anything that might explode other than gases. This fact, under the doctrine of res ipsa loquitur, upon which the District Court relied, justified the finding of liability.

In the District Court's opinion, the facts are discussed at considerable length, and it is unnecessary to comment further concerning them. We find from an examination of the record substantial evidence, sufficient to justify a finding that the explosion was caused by explosion of diffused, leaking gases in the steering gear room, which would not have occurred in the ordinary course of events. The court, sitting as a trier of the facts, and passing upon the questions of negligence as a jury would pass upon the same, had credible evidence to support its conclusion. While an appeal in admiralty is a trial de novo, the findings of the District Court will be accepted unless clearly against the preponderance of the evidence. Johnson v. Kosmos Portland Cement Co. (C. C. A. 6) 64 F.(2d) 193; The Ludvig Holberg, 157 U. S. 60, 71, 15 S. Ct. 477, 39 L. Ed. 620. Consequently, we are not justified in attempting to substitute our judgment upon the facts for that of the District Court.

From the conclusion that there was an explosion of leaking gas that would not have ordinarily occurred, the court was justified in concluding that the doctrine of res ipsa loquitur applied. In The Rambler (C. C. A. 2) 290 F. 791, the court

said: "The explosion destroyed the Rambler, hurled fragments of vessel and boiler to a great distance, killed the crew on board, and injured property and other persons. From the nature of things there could not be any evidence of what was done or omitted on board the tug immediately before explosion. The reason for disaster remains wholly unknown, so far as any direct evidence of recent acts is concerned. * * * By the contention of the petitioner, no reason is shown for the explosion. We have no doubt that these facts present a clear case for applying the rule commonly spoken of as that of 'res ipsa loquitur.' * * * The court as trier of the facts is like a jury; we may infer negligence from the bald fact of explosion, and we do."

In the case The Columbia (D. C.) 25 F. (2d) 516, 517 (affirmed in Re Petition of Union Ferry Co. (C. C. A.) 25 F.(2d) 518, certiorari denied Union Ferry Co. v. Moore, 277 U. S. 595, 48 S. Ct. 530, 72 L. Ed. 1005), the court said: "There is no direct evidence as to the cause of the explosion. * * * There can be no recovery in this case unless there is a presumption of negligence, under the doctrine of res ipsa loquitur. This doctrine does, in my opinion, apply in this case, because while the explosion may have been the result of mismanagement on the part of the deceased engineer, there is no evidence of any kind from which it could be determined that such was the fact, or in what way the mismanagement caused the explosion; but we do know that the explosion occurred, and that there was air in the gas bag, and that an explosion might result from the air if the flame traveled back into the bag, and that this danger might have been avoided if the gas bag had been purged of air." See, also, Central R. Co. v. Peluso (C. C. A.) 286 F. 661; Rose v. Stephens & C. Transp. Co. (C. C.) 11 F. 438.

▮ Appellant argues that to sustain the decree, this court must build up an inference based upon other inferences and that before the doctrine of res ipsa loquitur can apply there must be direct proof of the cause of the accident. We think the argument is falacious. Truly, there must be proof of an accident, and there must likewise be sufficient proof that it occurred out of the ordinary course of events; that it was extraordinary in character. Proof of the accident and of what caused it need not be by direct evidence or by the testimony of eye witnesses. Indeed, the rule has its origin and reason in cases frequently arising where there is no direct evidence as to the exact cause of the accident. In substantially all cases, the evidence offered in support of the claimant's case, under this rule, is necessarily indirect or circumstantial, but it is none the less competent. So, here, there was an explosion in a room where there was nothing to cause it other than gases. There were present methane and carbon monoxide. Presence of explosive gases, absence of any other explosives, difficulty with gases in the past and the fact that an explosion could not have occurred, except through some extraordinary cause, create a situation making the accident of such an unusual character as to justify consistently only the finding that the accident was due to negligence of those having possession or control of the things where the injury occurred. This inference rightfully arises, not merely because the accident speaks for itself, but because the facts are such that unless other explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of duty. This doctrine is directly applicable here.

▮ It is contended by appellant, however, that the property was not within the exclusive control of appellant. We find nothing to justify a finding that any of the appellees had any control over the conditions out of which this accident arose. There was no showing of contributory negligence upon the part of any of the appellees in the fact that they had, to some degree, duties to perform on the boat. This fact, in the absence of any evidence that they did anything which might contribute to the injury, is insufficient to invalidate the decree of the court. So in Inland & Sea-Board Coasting Co. v. Tolson, 139 U. S. 551, 11 S. Ct. 653, 654, 35 L. Ed. 270, the Supreme Court said: " 'If the jury believe from the evidence that the wharf in question was an ordinarily strong and good one, and suitable for the purpose for which it was constructed, and that in making the landing in question the boat was thrown against the wharf with such force as to tear up some of the planks or boards of the flooring, this would be prima facie

284

evidence of negligence on the part of the agents of defendant under the circumstances in making such landing, and would justify the jury in so finding, unless upon the whole evidence such prima facie evidence is rebutted.' * * * As such damage to a wharf is not ordinarily done by a steam-boat under control of her officers and carefully managed by them, evidence that such damage was done in this case was prima facie, and, if unexplained, sufficient evidence of negligence on their part, and the jury might properly be so instructed. * * * Rose v. Stephens & Condit. Co. [C. C.] 11 F. 438." See, also, San Juan Light & T. Co. v. Requena, 224 U. S. 89, 32 S. Ct. 399, 56 L. Ed. 680; American Glycerin Co. v. Brown (C. C. A.) 30 F.(2d) 316; Wychgel v. States Steamship Co., 135 Or. 475, 296 P. 863, certiorari denied 284 U. S. 625; 52 S. Ct. 11, 76 L. Ed. 533; Marceau v. Rutland R. Co., 211 N. Y. 203, 105 N. E. 206, 51 L. R. A. (N. S.) 1221, Ann. Cas. 1915C, 511. These cases have to do with similar situations, where the facts and circumstances were not sufficient to show that the duties of the complaining parties were such as to have any contributing effect upon the accident.

■ Nor can we agree that the doctrine of res ipsa loquitur does not apply in actions brought by employees against employers. By the Federal Employers' Liability Act (45 USCA §§ 51–59), which governs here, the defenses based upon the fellow-servant rule and contributory negligence have been abolished except that the latter may mitigate damages. Consequently, the doctrine of res ipsa loquitur is unhampered in its application. See Central R. Co. v. Peluso (C. C. A. 2) 286 F. 661, certiorari denied 261 U. S. 613, 43 S. Ct. 359, 67 L. Ed. 827; New Orleans & N. E. R. Co. v. Harris, 247 U. S. 367, 38 S. Ct. 535, 62 L. Ed. 1167; Looney v. Metropolitan R. Co., 200 U. S. 480, 26 S. Ct. 303, 50 L. Ed. 564; Patton v. Texas & Pacific R. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Baltimore & O. R. Co. v. Kast (C. C. A.) 299 F. 419, 423; Virginia & S. W. R. Co. v. Hawk (C. C. A.) 160 F. 348.

Other contentions are presented by appellant, but what has been said is sufficient to indicate the court's conclusion with regard to the same. The decree of the District Court is affirmed.